IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| GAGE, Inc., a Utah corporation, <br><br> Plaintiff, <br><br><br> vs. <br><br><br> BIOCONVERSION TECHNOLOGY, LLC, a Colorado limited liability company; ROBERT E. KLEPPER, an individual; KENNETH L. KLEPPER, an individual; RANGE FUELS, INC. f/k/a/ KERGY, INC., a Delaware corporation; KHOSLA VENTURES, LLC, a Delaware limited liability corporation; VINOD KHOSLA, an individual; and JOHN DOES1 through 10, <br><br> Defendants. | MEMORANDUM DECISION AND ORDER <br><br><br><br> Case No. 2:08-CV-57 DB |

This matter is before the court on defendants Range Fuels, Inc., Khosla Ventures, LLC, and Vinod Khosla's (collectively the "Khosla defendants") motion to dismiss claims for lack of personal jurisdiction or, in the alternative, transfer claims or the entire action.  (Dkt. No. 73.) Defendants BioConversion Technology, LLC, Robert E. "Bud" Klepper and Kenneth L. Klepper (collectively "BCT") joined in the Khosla defendants' motion, in part, for the limited purpose of requesting a transfer of this action should the court conclude it does not have personal

jurisdiction over the Khosla defendants.  (Dkt. No. 80.)  A hearing on the motion was held on

August 13, 2009.  At the hearing, the Khosla defendants were represented by Nathan L. Walker

and Milo Marsden.  The BCT defendants were represented by Christopher Hill.  Plaintiff GAGE

was represented by David J. Jordan and David L. Mortensen.  Before the hearing, the court

considered carefully the memoranda and other materials submitted by the parties.  Since taking

the motion under advisement, the court has further considered the law and facts relating to the

motion.  Now being fully advised, the court renders the following Memorandum Decision and

Order.

### **BACKGROUND FACTS**

In reviewing the factual background of this case the court is mindful that "the allegations

in the [plaintiff's] complaint must be taken as true to the extent they are uncontroverted by the

defendants' affidavits."  Behagen v. Amateur Basketball Ass'n, 744 F.2d 731, 733 (10th Cir.

1984).  If there is conflicting evidence, the court is to "resolve all factual disputes in favor of the

plaintiff in determining whether plaintiff has made a prima facie showing that establishes

jurisdiction."  Far West Capital v. Towne, 46 F.3d 1071, 1075 (10th Cir. 1995).  With these

standards in mind, the court considers the facts and allegations in this case.

Plaintiff GAGE, Inc., is a Utah corporation with its principal place of business in Salt

Lake City, Utah.  GAGE is in the business of marketing and promoting solutions for using

renewable energy technologies.  (Second Am. Compl. ¶¶ 1, 12.)  Defendant BioConversion

Technology (BCT) is a limited liability company organized under Colorado law, with its

principal place of business in Denver, Colorado.  (Id. ¶ 2.)  BCT is in the business of

researching, developing and producing technology to convert certain products into fuels and energy through the process of pyrolitic steam reforming gasification.  (Id. ¶ 13.) Defendant Robert "Bud" Klepper is a former manager of BCT, and resides in Colorado.  Defendant Ken Klepper also resides in Colorado, and is the President of BCT.  (Id. ¶¶ 3-4.)

In 2003, the founders of GAGE developed a relationship with BCT over their shared interest in commercializing BCT's technology (the "Technology").  (Id. ¶ 15.)  On May 24, 2004, GAGE and BCT entered into a written license agreement (the "License Agreement"). Pursuant to the License Agreement, BCT granted GAGE certain rights in the Technology to allow GAGE to market and site-license BCT's Technology to third parties for the conversion of materials, including natural gas, agricultural waste, and/or municipal solid waste to fuels and energy.  (Second Am. Compl. ¶ 21.)  BCT also granted GAGE priority testing rights and a right of first refusal for certain projects.

The License Agreement was "made in the state of Utah," and identifies GAGE as a Utah corporation located in Grantsville, Utah.  (Exh. A to Second Am. Compl., License Agreement at 1, 16.)  The License Agreement states that it "shall be governed by and construed and enforced in accordance with the local laws of the state [of Utah]."  (Id. § 10.2.)  The License Agreement also provides that GAGE and BCT "irrevocably submit[] to the personal jurisdiction of any state or federal court located in Salt Lake County, Utah," and states that GAGE and BCT "irrevocably waive[] the defense of any inconvenient forum and consent[] that jurisdiction shall lie exclusively with one of those courts."  (Id. § 8.3.)

Even before the License Agreement was signed, GAGE began promoting BCT's

Technology and actively pursuing the negotiation and sale of installation projects.  (Second Am. Compl. ¶ 28.)  And, at all times relevant to this litigation, GAGE continued to promote the Technology and pursue the negotiation and sale of installation projects with numerous entities, including a number of Utah-based companies.  (Id. ¶¶ 33-42.)

However, shortly after the License Agreement was signed, and after several attempts to demonstrate the Technology to potential site-licensees, it appeared that BCT did not then have the capacity to fulfill its obligation to provide a reliable, commercial grade technology that was ready for GAGE to market.  (Id. ¶ 29.)  Nonetheless, GAGE continued to pursue its obligations under the License Agreement, but struggled to succeed due to BCT's failure to provide a commercially viable technology.  (Id. ¶¶ 34-41.)

Consequently, in addition to actively promoting BCT's technology, GAGE also assisted BCT in their efforts to commercialize the Technology.  For example, GAGE provided cash to BCT, purchased equipment for BCT's testing facility, and purchased supplies to operate and repair BCT's equipment.  Additionally, GAGE introduced BCT to several of GAGE's prospects with interest in funding the commercialization of the Technology.  (Id. ¶ 32.)

As a result of GAGE's efforts, in 2005 MPR and Associates was hired to provide engineering services and to generate a report to verify BCT's conversion process and to confirm that the Technology was commercially viable.  Among other things, MPR and Associates was retained to evaluate the Technology and provide an Engineer Procure Construct Package, indentifying the equipment necessary to manufacture a plant using the Technology. ( Id. ¶ 32.) The MPR Report verified and confirmed the commercial viability of the Technology.  (Id. ¶ 53.)

After the MPR Report was completed, its results and the interest in the Technology generated by GAGE's marketing efforts resulted in a dramatic increase in commercial momentum for the Technology and BCT.  (Id.)

During the fall of 2005, Mr. Vinod Khosla and Khosla Ventures began a relationship with BCT.  (Second Am. Compl. ¶ 43.)  Khosla Ventures is a limited liability corporation, organized under Delaware law, with its principal place of business in Menlo Park, California. Mr. Vinod Khosla, who resides in California, is an entrepreneur and the founder of Khosla Ventures. (Id. ¶¶ 18-19.)  Shortly after receiving the MPR Report, BCT leaked the report to Mr. Vinod Khosla and Khosla Ventures. (Id. ¶ 54.)  The Khosla defendants began negotiations with BCT, seeking rights to BCT's technology in contravention of BCT's License Agreement with GAGE. (Id. ¶ 44.)

In October of 2005, shortly after BCT was contacted by the Khosla defendants regarding their desire to commercialize BCT's technology, BCT sent a letter to GAGE declaring that the License Agreement was "in default" (the 2005 Termination Letter).  (Id. ¶¶ 47-48.)  BCT claimed that GAGE's default was due to "a lack of sales performance for one year as required in the [License Agreement]."  (Id. ¶ 47.)  BCT also claimed that the breach was "incurable due to the time expiring for the performance requirement."  (Id.)  BCT also stated, however, that despite GAGE's alleged lack of performance, BCT did not want to terminate the parties' relationship, rather it wanted to negotiate a new agreement with GAGE.  (Id.)

Upon receipt of the 2005 Termination Letter, GAGE contacted Bud Klepper to discuss its contents.  Bud Klepper told GAGE that the letter was a form letter sent to all licensees, and that

5

in hindsight, it had been a mistake to send it to GAGE.  Bud Klepper apologized to GAGE and expressed his appreciation for all GAGE was doing to help BCT.  (<u>Id.</u> ¶ 49.)  In light of this conversation, GAGE understood that BCT did not intend to terminate the License Agreement. Nonetheless, GAGE prepared a formal response to the 2005 Termination Letter, rejecting BCT's assertion that the License Agreement was in default.  (<u>Id.</u> ¶ 50.)  Additionally, representatives from GAGE met personally with Bud Klepper to confirm that GAGE was not in default and that the License Agreement was not being terminated.  (<u>Id.</u> ¶ 51.)  Following this episode, GAGE continued to communicate with BCT regarding potential sales under the License Agreement, made site visits to BCT, received data from BCT regarding the Technology, and worked with Bud Klepper to market the technology.  (<u>Id.</u>)  As evidence of this on-going relationship, in an e-mail dated September 8, 2006, BCT "encourage[d] [GAGE] to exercise the rights of [its] license for the furtherance of GAGE [and] assured that BCT will continue it's [sic] business relationship as outlined in the license agreement."  (<u>Id.</u> ¶ 52.)

However, during this same time period, negotiations with the Khosla defendants continued.  The Khosla defendants requested and were given access to GAGE's License Agreement.  (<u>See</u> Mortensen Decla. Exhs. 2 & 3, e-mails between Khosla defendants and BCT.) The Khosla defendants then expressed "concern" that some of BCT's existing license agreements would interfere with their ability to capitalize on the Technology.  (Second Am. Compl. ¶ 57; Mortensen Decla. Exh. 2, e-mail dated 1/10/06 from V. Khosla to L. Robinson at BCT.).  Accordingly, the Khosla defendants charged BCT with "clean[ing] up" "all existing licensee agreements," and they informed BCT that they expected that "no outstanding licensees

[would] remain," other than those licensed to sell or operate a limited number of plants.

(Mortensen Decla. Exh. 3, e-mail dated 1/21/2006 from V. Khosla to L. Robinson at BCT.)  In

furtherance of their efforts, the Khosla defendants also offered the assistance of their legal

counsel to assist BCT in "cleaning up" the license agreements.  (Second Am. Compl. ¶ 57;

Mortensen Decla. Exh. 4, e-mail dated 4/24/2006, introducing BCT to Khosla attorney.)  The

Khosla defendants conditioned any agreement with BCT on BCT's termination of the GAGE

License Agreement.  (Second Am. Compl. ¶ 60; See Mortensen Decla. Exh. 3)

     During this same time, Bud Klepper informed representatives of GAGE that BCT was in

negotiations with Khosla Ventures and that he was frustrated that GAGE's License Agreement

and corresponding right of first refusal was "blocking" BCT's ability to create a relationship

with the Khosla defendants.  (Second Am. Compl. ¶ 55.)  In response, GAGE requested that

BCT comply with their obligation to provide a right of first refusal to GAGE.  (Id.)

     In the interim, Khosla Ventures founded and funded a biofuel startup company originally

named Kergy, Inc., now renamed Range Fuels.  (Id. ¶ 59.)  On or about September 2006, Range

Fuels hired Bud Klepper, previously the manager of BCT, to be Range Fuels' Chief Technical

Specialist and Inventor.  (Id.)  Range Fuels purports to hold an "innovative and proprietary

technology" that "transforms otherwise useless products such as wood chips, agricultural wastes,

grasses, and cornstalks as well as hog manure, municipal garbage, sawdust and paper pulp into

ethanol through a thermo-chemical conversion process."  (Id. ¶ 61.)

     On January 16, 2007, shortly after Bud Klepper joined forces with Range Fuels, BCT

sent GAGE a second letter purporting to terminate the License Agreement (the 2007 Termination

Letter).  The 2007 Termination letter claimed that  "in the 14 months" since BCT sent the 2005

Termination Letter, "GAGE has not cured the breach."  (Mortensen Decla. Exh. 12, 2007

Termination Letter.)  Specifically, BCT claimed that "GAGE has not proposed any potential Site

Licensees . . . as required by Section 2.4 of the Agreement."  BCT claimed that because GAGE

had not timely cured the purported default identified in the 2005 Termination Letter, "BCT

hereby terminates the Agreement pursuant to Section 5.4."  (Id.; Second Am. Compl. ¶ 64.)

On February 23, 2007, GAGE's legal counsel responded to the 2007 Termination Letter.

GAGE once again rejected BCT's claim that GAGE was in default under the License

Agreement, and rejected BCT's termination of the License Agreement.  (Second Am. Compl. ¶

66.)  GAGE also described what it perceived to be BCT's default under the License Agreement,

based on BCT's failure to give GAGE priority testing rights and/or testing opportunities, and by

entering into agreements with third-parties in direct violation of and/or in an attempt to

circumvent GAGE's right of first refusal.  (Id.)   By letter to GAGE dated March 7, 2007, BCT

repeated its claim that GAGE was in default under the License Agreement and that the License

Agreement was terminated.  (Id. ¶ 67; Mortensen Decla. Exh. 13, Letter dated 3/7/2007 from K.

Klepper.)  Correspondence between the Khosla defendants and BCT demonstrates that the

Khosla defendants were involved with and advised BCT on handling the termination of GAGE's

License Agreement.  (See Mortensen Decla. Exh. 8, e-mail dated 9/25/2007 from Range Fuels to

K. Klepper, re: GAGE, referring to 2007 Termination Letter and recommending to BCT that "we

. . . lean on our breach letter" (emphasis added).)

In November 2007, Range Fuels broke ground on its "first commercial-scale cellulosic

ethanol plant" in Soperton, Georgia.  (Second Am. Compl. ¶ 61.)  According to Range Fuels'

website, the plant will be the first in the United States "to produce commercial quantities of

ethanol from biomass, which includes all plant and plant-derived material, such as wood, grasses

and corn stover."  (Id. ¶ 61.)

On January 18, 2008, GAGE filed the original complaint in this case claiming that BCT,

Bud Klepper and Ken Klepper, had wrongfully terminated and breached the License Agreement

with GAGE.  GAGE filed suit in the United States District Court for the District of Utah, in

accord with the License Agreement which expressly provided that state and federal courts in

Utah would have exclusive jurisdiction over any dispute arising out of the License Agreement.

In January of 2009, GAGE amended its Utah lawsuit to include the Khosla defendants

as co-conspirators with BCT.  (Dkt. No. 53, Second Am. Compl. ¶¶ 6-7, )  Specifically, GAGE

alleges in its Second Amended Complaint that the Khosla defendants, wanting to acquire rights

in the BCT Technology contractually licensed to GAGE, tortiously interfered with GAGE's

License Agreement with BCT, and conspired with BCT to disrupt GAGE's relationship with

BCT.

In addition, also in January of 2009, GAGE filed a separate complaint against the Khosla

defendants in the United States District Court for the District of Colorado asserting claims for

civil conspiracy and tortious interference with contractual relations.  GAGE has not served the

Colorado complaint on the Khosla defendants, but filed the Colorado action as a protective

measure to ensure that its claims were filed within any potential statute of limitations, and to

safeguard against the possibility that the Khosla defendants would challenge this court's

jurisdiction.[1]

On March 4, 2009, the Khosla defendants filed the present motion asserting that they are not subject to personal jurisdiction in Utah.  Range Fuels is based in Colorado, Khosla Ventures is based in California, and Mr. Khosla lives in California, and the Khosla defendants assert that they have not engaged in any business in Utah or directed any purposeful activities to residents in Utah related to GAGE's allegations.  Accordingly, the Khosla defendants ask the court to do one of the following: (1) dismiss the claims against the Khosla defendants in this action in favor of the pending Colorado action, leaving the remaining claims against BCT to be adjudicated in this court; (2) transfer the claims against the Khosla defendants in this action in favor of the pending Colorado action, again leaving BCT's claims to be resolved in this court; or (3) transfer the entire action, including the claims against BCT, to the court in Colorado so that the entire action can be tried in a single forum by a court with personal jurisdiction over all of the parties. (Khosla Defendant's Mem. in Supp. at 1-2.)

GAGE responds that the Khosla defendants were fully aware of GAGE and its Utah ties, and that the Khosla defendants knowingly directed their tortious activities and civil conspiracy at this forum.  GAGE asserts that under these circumstances, the Khosla defendants certainly should have anticipated that they could be haled into court in Utah, and cannot now complain that traditional notions of fair play and substantial justice are violated by their presence in this

---

[1]Although GAGE did not serve the Colorado complaint on the Khosla Defendants, Range Fuels, which is located in Colorado, promptly answered the complaint, denying GAGE's claims but admitting that it is subject to personal jurisdiction in Colorado.  The parties have since agreed to stay the Colorado action pending resolution of the Khosla defendant's personal jurisdiction motion in this case.

litigation.  Accordingly, GAGE asserts that this court has personal jurisdiction over the Khosla

defendants and GAGE should be entitled to litigate against BCT and its co-conspirators in its

chosen forum.

## DISCUSSION

When, as in this case, the court considers a motion to dismiss for lack of personal

jurisdiction without conducting an evidentiary hearing, "the plaintiff need only make a prima

facie showing of personal jurisdiction to defeat the motion."  OMI Holdings, Inc. v. Royal Ins.

Co., 149 F.3d 1086, 1091 (10th Cir. 1998).  The plaintiff may make this prima facie showing by

demonstrating by affidavit or other written materials, facts that if true would support jurisdiction

over the defendant.  Id.  In order to defeat the plaintiff's prima facie showing of personal

jurisdiction, the moving defendant must present a compelling case demonstrating "that the

presence of some other considerations would render jurisdiction unreasonable."  OMI Holdings,

149 F.3d at 1091 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)).

Turning to the test for personal jurisdiction, to which these standards apply, to obtain

personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show (1)

that jurisdiction is legitimate under the laws of the forum state, and (2) that the exercise of

jurisdiction does not offend the due process clause of the Fourteenth Amendment.  Soma

Medical Int'l v. Standard Chartered Bank, 196 F.3d 1292, 1295 (10th Cir. 1999).

## I.  Jurisdiction Under State Law

The Utah legislature has expressly stated that the long arm statute must be interpreted

broadly "so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by

the due process clause of the Fourteenth Amendment to the United States Constitution."  Utah

Code § 78B-3-201; see also Starways, Inc. v. Curry, 980 F.2d 204, 206 (Utah 1999) ("We have

held that the Utah long-arm statute 'must be extended to the fullest extent allowed by due

process of law.'") (quoting Synergetics v. Marathon Ranching Co., 701 F.2d 1106, 1110 (Utah

1985)).  The Utah Supreme Court has stated that it "frequently make[s] a due process analysis

first because any set of circumstances that satisfies due process will also satisfy the long-arm

statute."  SII MegaDiamond, Inc. v. American Superabrasives Corp., 969 P.2d 430, 433 (Utah

1998).  Therefore, following the direction of the Utah Supreme Court, and because the Utah

long-arm statute confers the maximum jurisdiction permissible consistent with the Due Process

Clause, the court proceeds to determine whether the exercise of personal jurisdiction over the

Khosla defendants meets federal due process standards.

## II.  Due Process Analysis

"The Due Process Clause protects an individual's liberty interest in not being subject to

the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or

relations.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985) (quoting

International Shoe Co. v. Washington, 326 U.S. 310, 319 (1945)); see also OMI Holdings, Inc. v.

Royal Ins. Co. of Canada, 149 F.3d 1086, 1090 (10th Cir. 1998).  Accordingly, a "court may

exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum

contacts' between the defendant and the forum state."  World Wide Volkswagen Corp. v.

Woodson, 444 U.S. 286, 291 (1980) (quoting International Shoe, 326 U.S. at 316).  The

minimum contacts standard can be met in two ways.  First, a court may assert *specific* personal jurisdiction over a nonresident defendant where "the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or are related to those activities."  Burger King, 471 U.S. at 472.  Where no nexus exists between the forum-related activity and the injury sustained, the court may nevertheless exercise *general* jurisdiction over the defendant when the defendant's contacts are "so pervasive that personal jurisdiction is conferred by the 'continuous and systematic' nature of the defendant's in-state activities."  OMI Holdings, 149 F.3d at 1090-91.

### A.  Specific Jurisdiction

The court's specific jurisdiction inquiry is two-fold.  First, the court must determine whether the defendant has such "minimum contacts" with the forum state "that he should reasonably anticipate being haled into court there.  World-Wide Volkswagen, 444 U.S. at 297. These "minimum contacts" are established "'if the defendant has "purposefully directed" his activities at residents of the forum and the litigation results from alleged injuries that "arise out of or relate to" those activities.'"  OMI Holdings, 149 F.3d at 1091 (quoting Burger King, 471 U.S. at 472.)  Second, if the defendant's activities create sufficient minimum contacts, then the court must consider "whether the exercise of personal jurisdiction over the defendant offends "traditional notions of fair play and substantial justice."  Id. (quoting Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102, 113 (1987)).  This latter inquiry requires a determination of whether a district court's exercise of personal jurisdiction over a defendant with minimum contacts is "reasonable" in light of the circumstances surrounding the case.  OMI

<u>Holdings</u>, 149 F.3d at 1091.

The United States Court of Appeals for the Tenth Circuit has explained that "an interplay exists between the two components, such that 'depending on the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry.'" <u>Id.</u> at 1091-92 (quoting Met Life 84 F.3d at 568 or Int Shoe, 326 U.S. 310, 316.))

### 1. **Minimum Contacts**

"[T]he Supreme Court has instructed that the "minimum contacts" standard requires, first, that the out-of-state defendant must have "purposefully directed" its activities at residents of the forum state, and second, that the plaintiff's injuries must "arise out of" defendant's forum-related activities." <u>Dudnikov v. Chalk & Vermilion Fine Arts, Inc.</u>, 514 F.3d 1063, 1071 (10th Cir. 2008) (quoting <u>Burger King</u>, 471 U.S. at 472.)  The United States Court of Appeals for the Tenth Circuit has explained, however, that the "purposeful direction" requirement can appear in "different guises."  <u>Id.</u>  In contract cases, "we sometimes ask whether the defendant "purposefully availed" itself of conducting business in the forum state; in the tort context, meanwhile, "we often ask whether the non resident defendant 'purposefully directed' its activities at the forum state."  <u>Id.</u> (citing <u>Bell Helicopter Textron, Inc. V. Hekiqwest Int'l, Ltd.</u>, 385 F.3d 1291, 1296 (10th Cir. 2004).  Under either approach, the "shared aim of purposeful direction" is to "ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state."  <u>Id.</u> (quoting <u>Burger King</u>, 471 U.S. at 475.)

14

In this case, GAGE attempts to satisfy the "purposeful direction" requirement by application of the "effects test" set forth by the United States Supreme Court in Calder v. Jones, 465 U.S. 783, 789-90 (1984), and more recently applied by the Tenth Circuit in Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063 (2008). Specifically, GAGE contends that the Khosla defendants' involvement with and participation in BCT's termination of GAGE's License Agreement demonstrates that the Khosla defendants expressly aimed their activities at Utah residents, and that Utah has been the focal point of both the tort and of the resulting harm.

In Dudnikov, the Tenth Circuit extensively examined the application of Calder in the context of an intentional interference claim. In that case, the plaintiffs, located in Colorado, were in the business of selling fabric via internet auctions on eBay. 514 F.3d at 1068. Claiming that one of plaintiffs' fabrics infringed their copyright, the defendants, located in Connecticut and the United Kingdom, sent a Notice of Claimed Infringement" ("NOCI") to eBay, located in California, seeking to suspend the Colorado plaintiffs' online auction. Id. In response, plaintiffs filed a declaratory judgment action in Colorado and defendants moved to dismiss for lack of personal jurisdiction. In setting forth the requirements a plaintiff must allege to show "purposeful direction," the Tenth Circuit stated: "Distilling Calder to its essence we thus understand the Court to have found purposeful direction there because of the presence of (a) an intentional action . . . that was (b) expressly aimed at the forum state . . . with (c) knowledge that the brunt of the injury would be felt in the forum state." Id.

Applying this standard, and ultimately reversing the district court's decision that it lacked jurisdiction, the Tenth Circuit observed, first, that the defendant was alleged to have committed

an intentional, wrongful act–tortious interference.  Second, the court found that although the

defendants' NOCI was sent to eBay in California, its intended effect was to cancel plaintiffs'

auction in Colorado, and therefore the defendants' "aim" was to "reach into Colorado."  Finally,

the court found that the defendants knew that by sending the NOCI the plaintiffs would be

harmed in Colorado.  Therefore, the court concluded, pursuant to Calder, the plaintiffs had

alleged "purposeful direction" at Colorado sufficient for minimum contacts.  Id. at 1078-79.

     The court in Dudnikov readily acknowledged that the law in this area can be confusing

and unpredictable, id. at 1071, and to some extent the decision in Dudnikov is no exception.

However, the facts and results of Dudnikov are clear, and this court is unable to find any

meaningful distinction between the facts of the case now before the court and those in Dudnikov.

Therefore, pursuant to the Calder effects test, as set forth in Dudnikov, this court likewise finds

that GAGE has sufficiently alleged "purposeful direction," and the Khosla defendants have the

requisite minimum contacts with Utah.

     First, like the defendants in Dudnikov, the Khosla defendants are alleged to have

committed the intentional tort of tortious interference.  In that regard, GAGE has sufficiently

alleged that the Khosla defendants knew of GAGE's License Agreement with BCT, and

expressly conditioned any business relationship with BCT on the termination of all then-existing

license agreements.  (Second Am Compl. ¶¶ 57, 60.)  Beyond that, GAGE has alleged that the

Khosla defendants spent months conspiring with BCT, discussing a strategy for, and then

providing legal advice on how to terminate GAGE's License Agreement.  (Id. ¶¶ 58, 64, 68.)

These allegations are sufficient to allege an intentional tortious act.[2]

Second, as in <u>Dudnikov</u>, the court finds that the Khosla defendants' conduct was expressly aimed at the forum.  The <u>Dudnikov</u> court explained that the "express aiming" test focuses on a defendant's intentions–what was the "focal point of [the defendant's] purposive efforts."  <u>Id.</u> at 1075.  In this case, the focal point of the Khosla defendants' efforts was the termination of a Utah contract–GAGE's License Agreement.  Having requested and received a copy of the License Agreement, the Khosla defendants knew that GAGE, a Utah corporation with its principal place of business in Utah, was the holder of certain property rights sought after by the Khosla defendants.  Additionally, the Khosla defendants knew that the License Agreement was made in the state of Utah, that it contained a forum selection clause for Utah, and that it contained a Utah choice-of-law provision.  With this knowledge, the Khosla defendants thereafter directed BCT to "clean up" its licensee agreements and then provided legal counsel and specific instruction concerning the termination of GAGE's License Agreement in particular.  Given these facts, plaintiff has shown that the intended effect of the defendants' conduct was the termination of GAGE's License Agreement.  Stated another way, as the court did in <u>Dudnikov</u>, the "express aim" of the Khosla defendants' conduct was to effectively reach into Utah and terminate GAGE's License Agreement.  <u>See</u> <u>Dudnikov</u>, 514 F.3d at 1075 ("Here, defendants intended to send the NOCI to eBay in California, but they did so with the ultimate purpose of

_____

[2]In <u>Dudnikov</u>, the parties disputed whether *any* intentional act, wrongful or not, would suffice under <u>Calder</u>.  <u>See</u> <u>Dudnikov</u>, 514 F.3d at 1073.  The Tenth Circuit was able to "avoid entering this thicket," however, because it found that "even if <u>Calder</u> can be properly read as requiring some form of 'wrongful' intentional conduct, . . . [plaintiff's] complaint complies." <u>Id.</u> The same is true in this case.

cancelling plaintiffs' auction in Colorado.  Their 'express aim' thus can be said to have reached

into Colorado . . . .").

       In making this determination, the court is mindful that the mere location of plaintiff's

corporate domicile is insufficient to establish jurisdiction, Far West, 46 F.3d 1071, 1080 (10th

Cir. 1995), and a plaintiff must allege "something more" than mere foreseeability that a

defendant's actions will have effects in the forum, Dudnikov, 514 F.3d 1077.  However, this is

not a case where the Khosla defendants simply wanted to obtain their own license agreement

with BCT, which might have the "foreseeable side effect" or unintended consequence of injuring

other licensees, including GAGE in Utah.  To the contrary, as explained above, the Khosla

defendants specifically targeted the Utah License Agreement with GAGE.  By collaborating with

BCT, providing legal assistance, and rendering opinions concerning the best approach for

terminating the Utah contract with GAGE, Utah became the "focal point" of the Khosla

defendants' harm.  "So long as a commercial actor's efforts are 'purposefully directed' toward

residents of another State, we have consistently rejected the notion that an absence of physical

contacts can defeat personal jurisdiction there."  Burger King, 471 U.S. at 476.  Such is the case

before the court, the Khosla defendants' intent was to terminate GAGE's Utah License

Agreement, and neither the lack of defendants physical presence in Utah nor the fact that it was

BCT, a Colorado-based entity, who actually terminated the agreement diminishes this fact.  See

Dudnikov, 514 F.3d at 1076-77 ("Defendants' express aim in acting was to halt a Colorado-

based sale by a Colorado resident, and neither the lack of defendants' physical presence in

Colorado nor the fact that they used a California-based entity to effectuate this purpose

diminishes this fact.").

Finally, as in <u>Dudnikov</u>, there is no meaningful dispute that the brunt of plaintiff's injury was suffered in the forum state.  <u>Dudnikov</u>, 514 F.3d at 1077.  And, for reasons previously discussed, GAGE has satisfied its burden of establishing, at this stage, that the Khosla defendants knew GAGE's business was based in Utah, and therefore knew the effects of the tortious interference would be felt in Utah.

Having determined that the Khosla defendants "purposefully directed" their activities at the forum state, the court has no difficulty concluding that GAGE's injuries "arise out of " the Khosla defendants' contacts with the forum jurisdiction.  <u>See</u> <u>Burger King</u>, 471 U.S. at 472.  GAGE's intentional interference and conspiracy claims arose from the Khosla defendants' relationship with BCT, which included assisting and advising BCT regarding the termination of GAGE's License Agreement.  Those same interactions also constitute the Khosla defendants' contacts with Utah.  Therefore, the court concludes that GAGE has alleged facts sufficient to support a finding that the Khosla defendants' conduct was "purposefully directed" at Utah and that GAGE's claims arose out of defendants' contacts with Utah such that the Khosla defendants have minimum contacts with Utah.[3]

_____

[3]This approach and conclusion is consistent with the Utah Supreme Court's recent interpretation of its own long-arm statute in <u>Pohl, Inc. v. Webelhuth</u>, 201 P.3d 944 (Utah 2008) (applying <u>Calder</u> "effects" test and finding plaintiff pled facts alleging an injury in Utah, caused by tortious conduct, sufficient to establish personal jurisdiction under the long-arm statute and minimum contacts as required by federal due process).  Although it appears somewhat different than the Tenth Circuit's approach in <u>Far West Capital, Inc. v. Towne</u>, 46 F.3d 1071, 1080 (10th Cir. 1995), the <u>Dudnikov</u> court expressly stated that its decision was in accord with <u>Far West</u>, and that the plaintiff satisfied the Tenth Circuit's "more restrictive" requirement that the forum state itself must be the "focal point of the tort."  <u>Dudnikov</u>, 514 F.3d at 1063 n.9.  As stated above, the court cannot distinguish the facts of the present case from <u>Dudnikov</u>, and similarly

### 2. Reasonableness

Having determined that GAGE has met its burden of establishing "minimum contacts"

the court must still inquire whether the existence of personal jurisdiction would "offend

traditional notions of fair play and substantial justice." Dudnikov, 514 F.3d at 1080 (quoting

International Shoe, 326 U.S. at 316).  This inquiry requires a determination of whether a district

court's exercise of personal jurisdiction is "reasonable" in light of the circumstances surrounding

the case. OMI Holdings, 149 F.3d at 1091.  In this regard, the court should consider: (1) the

burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's

interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in

obtaining the most efficient resolution of controversies, and (5) the shared interest of the several

states in furthering fundamental substantive social policies.  Id. at 1095; World-Wide

Volkswagen, 444 U.S. at 292.

The analyses of minimum contacts and reasonableness are complimentary, such that the

reasonableness prong of the due process inquiry evokes a sliding scale:

> the weaker the plaintiff's showing on [minimum contacts], the less a defendant need
> show in terms of unreasonableness to defeat jurisdiction.  The reverse is equally true: an
> especially strong showing of reasonableness may serve to fortify a borderline showing of
> [minimum contacts].

Pro Axess, Inc. v. Orlux Distribution, Inc. , 428 F.3d 1270, 1280 (10th Cir. 2005) (quoting OMI

at 1092 (alterations in original) (quotations omitted)).  However, in a case such as this, where the

court has found that the defendants "purposefully ... directed [their] activities"at Utah, in order to

defeat jurisdiction, the defendants "must present a compelling case that the presence of some

─────────────────────

concludes that the facts of this case would yield the same result under Far West.

other considerations would render jurisdiction unreasonable." Burger King, 471 U.S. at 477.

The Khosla defendants are unable to meet this high standard.

### a.  Burden on Defendant of Litigating in the Forum

With respect to the first factor--the burden on defendants–the Khosla defendants have

expressly acknowledged that "the imposition of this burden and expense *would be fair and*

*reasonable* if [they] had purposefully directed acts at Utah that formed the basis for GAGE's

claims." (Defs.' Mem. in Supp. at 12.)  Given this courts conclusion that the Khosla defendants

did, in fact, purposefully direct tortious activity at Utah, the Khosla defendants have effectively

conceded that this factor weighs in favor of Plaintiffs.  Moreover, even without this concession,

Khosla defendants have failed to support their conclusory allegation that litigating in Utah would

impose an "unreasonable burden on them."  (Id.)  Although Vinod Khosla and Khosla Ventures

are located in California and BCT is located in Colorado, Utah is located between the two states,

and both are relatively close in proximity.  Moreover, modern transportation and

communication, and in particular the implementation of electronic case filing, noticing and

teleconferences, have to some extent lessened the burden to out-of-state defendants.  Toytrackerz

v. Koehler, Slip Copy, 2009 WL 1505705 (D. Kan.). While "inconvenience may at some point

become so substantial as to achieve constitutional magnitude, this is not such a case."  Burger

King, 471 U.S. at 484 (internal citation omitted)

### b.  Forum State's Interest in Adjudicating the Dispute

With respect to the second factor, the court considers the interest of Utah in resolving the

dispute.  The states have "an important interest in providing a forum in which their residents can

seek redress for injuries caused by out-of-state actors."  <u>OMI Holdings</u>, 149 F.3d at 1096.  In this case, the court finds that Utah has a strong interest in adjudicating this controversy.  GAGE not only resides in Utah, but also has suffered significant injury and monetary damages within the state.  <u>See</u> <u>Burger King</u>, 471 U.S. at 483-84.

### c.  Plaintiff's Interest in Convenient and Effective Relief

This factor hinges on whether the plaintiff may receive convenient and effective relief in another forum.  In this case, the Khosla defendants claim that the mere fact that GAGE filed a complaint against them in Colorado "confirm[s] that GAGE may obtain convenient and effective relief in that forum."  (Defs.' Mem. In Supp. at 13.)  However, GAGE filed the Colorado lawsuit not because Colorado was a convenient forum, but as a precautionary measure in the event the Khosla defendants challenged jurisdiction in this court.

Moreover, requiring GAGE to litigate its dispute with the Khosla defendants in another forum will have the effect of requiring GAGE to litigate the same claims, based on the same allegations, twice–once in Utah against BCT pursuant to the License Agreement, and then a second time against the Khosla defendants in Colorado.  Requiring GAGE to pursue this course of action, with the potential for inconsistent outcomes, is anything but convenient and is potentially ineffective.

### d.  Interstate Judicial System's Interest in Obtaining Efficient Resolution

This factor asks whether the forum state is the most efficient place to litigate the dispute.  <u>Pro Axess, Inc. v. Orlux Distrib., Inc.</u>, 428 F.3d 1270, 1281 (10th Cir. 2005).  In evaluating this factor, courts look to the location of witnesses, the location of the underlying wrong, what

forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation.  Id.

Based on a review of the initial disclosures, it appears that the majority of witnesses are located in Utah.  Of the thirty-seven witnesses identified by GAGE, at least ten reside in Utah, while only six reside in Colorado.  Similarly, of the nine witnesses identified by BCT, five of those individuals reside in Utah, not Colorado.  Moreover, even the Khosla defendants disclosed more California witnesses than Colorado witnesses.  (See GAGE's Mem. In Opp'n at 12.)  Additionally, although it has yet to be determined what law applies to GAGE's claims against the Khosla defendants, Utah law unquestionably applies to the court's interpretation of the Licence Agreement.  Finally, given the forum selection clause in the License Agreement between GAGE and BCT, jurisdiction in Utah would prevent piecemeal litigation as Utah is the only forum in which the claims against all of the parties can be heard.  In sum, the court finds that the interstate judicial system's interest is best served by litigating the dispute in Utah.

### e.  States' Interest in Furthering Fundamental Substantive Social Policies

The fifth factor of the reasonableness inquiry focuses on whether the exercise of personal jurisdiction by the forum state affects the "substantive social policy interests of other states or foreign nations." Asahi, 480 U.S. at 115; OMI Holdings, 149 F.3d at 1097.  The court finds no facts suggesting that the exercise of personal jurisdiction in Utah would affect the substantive social policy interests of any other state or foreign nation.

After evaluating the relevant factors, the court finds that the Khosla defendants have failed to establish a "compelling case" that the exercise of jurisdiction would be unreasonable.

Burger King, 471 U.S. at 477.  Accordingly, the court concludes that exercising personal jurisdiction over the Khosla defendants would not offend traditional notions of fair play and substantial justice.

## CONCLUSION

Having determined that the Khosla defendants have sufficient minimum contacts with this forum, and having further determined that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice, the court concludes that the Khosla defendants are subject to personal jurisdiction in this court.[4]  Accordingly, the court DENIES the Khosla defendants' motion to dismiss.

Dated this 29th day of September, 2009.

_Dee Benson_

_____
Dee Benson
United States District Judge

---

[4]Having determined that the Khosla defendants are subject specific personal jurisdiction in Utah, the court declines to address the issue of general jurisdiction.